**STEVEN J. ABELSON, ESQ.**
ID # SA 7987
63 West Main Street
PO Box 7005
Freehold, New Jersey 07728
(732) 462-4773
Attorney for Debtor

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | : |
| | :       Chapter 13 |
| FRANCISCO RODRIGUEZ and | : |
|   ANNA RODRIGUEZ | :       Case No: 07-24687 (MBK) |
| | : |
| | : **DEBTOR'S REPLY MEMORANDUM TO** |
| Debtors | :  **OPPOSITION BY COUNTRYWIDE TO** |
| | : **DEBTORS MOTION TO ENFORCE STAY** |
| | :**AND IN FURTHER SUPPORT OF MOTION** |
| | : |
| | :       HEARING : 6/25/08 at 11:00 a.m. |
| | : |

Debtors, Francisco and Anna Rodriguez, in furtherance of their position set forth in the *Motion to Enforce Automatic Stay in addition to Motion to Compel Countrywide Home Loans to Reapply Escrow Balance to Debtor's Account, Prohibiting Post Petition Charges for Same and Awarding Fees per 11 U.S.C. § 362(k)* (Docket #10); and in the *Supplemental Certification in support of Motion to Enforce....* (Docket # 40) hereby submit as follows:

**FACTUAL RECITATION**

This dispute arises from the actions of Countrywide Home Loans in direct response to the filing of the Debtor's Chapter 13 petition on October 10, 2007. Debtors have admitted and

-1-

it is without contention that they were in arrears prior to the filing of their Bankruptcy petition. It is that fact that precipitated the bankruptcy filing. Debtor filed a Chapter 13 plan on 10/10/07 which provided an estimated payment to Countrywide of $ 17,500[1] for mortgage arrears and payment of $ 2,600 in regular monthly mortgage payments commencing 11/1/07 (Chapter 13 Plan, § 3a). Debtor's Chapter 13 Plan was confirmed on April 14, 2008.

Prior to filing, as set forth on the Escrow Account Review attached as Exhibit A to the Motion of December 3, 2007 (additional copy attached hereto), Debtor paid the monthly sum of $ 2,605.55 ($ 1,898.35 principal/interest and $ 707.20 escrow). As of the Escrow Statement dated 10/15/07, that amount was increased to $ 2,846.12, an increase of $ 240.57 immediately following, and by admission in response to the Debtor's filing for Bankruptcy. This increase is restated below:

| *Amount needed for taxes and insurance* | Last Analysis | This analysis |
|---|---|---|
| Homeowners insurance | $ 46.33 | $ 46.33 |
| FHA MIP | 127.62 | 125.87 |
| City taxes | 123.08 | 133.31 |
| City taxes | 123.08 | 133.31 |
| City taxes | 143.54 | 105.64 |
| City taxes | 143.54 | 105.64 |
| Total Base escrow payment | $707.20 | $650.10 |
| Shortage payment | .00 | 210.65 |
| Reserve requirement | .00 | 87.02 |
| Rounding amount | .00 | .00 |
| **Monthly escrow payment** | **$707.20** | **$ 947.77** |
| Principal and/or interest | $1898.35 | $1898.35 |
| Monthly escrow payment | 707.20 | 947.77 |
| **Total payment amount** | **$2,605.55** | **$2,846.12** |

Countrywide's claim for the post petition increase is rooted in this post petition escrow analysis which "resulted" in an alleged escrow shortage of $ 2,527.81, and as a result of said

---

[1] This estimate was low. Debtor was actually in arrears for eight (8) months which would consist of principal and interest of $ 15,186.80 ($1898.35 x 8) and **escrow of $ 5,657.60 ($707.20 x 8)**.

shortage, a demand for an additional "reserve requirement" or cushion of $ 1,044.26. In total, as a consequence of Debtor's filing for Bankruptcy relief, Countrywide has assessed additional escrow charges of $ 3,572.07 against the Debtors for payment within the first twelve post-petition months. This is in spite of the fact the projected escrow disbursements for this period <u>decreased</u> and the pre-petition escrow shortage is contained in, and will be repaid through the Debtor's Chapter 13 plan.

The factual justification by Countrywide for this action lies in the second line of the "Step 2" analysis of the 10/15/07 escrow Account Review, set forth on the Exhibit A to the 12/3/07 motion (with additional copy attached hereto) . That provision is repeated herein as follows:

| Month | Escrow deposit(s) | Tax payment(s) | Insurance payment(s) | MIP/PMI payment(s) | Balance |
|---|---|---|---|---|---|
| **Beginning Balance** | | | | | **$ 2,494.89** |
| | -2,494.89 | | | | .00 |
| October 2007 | | 1,267.64 | | | -1,267.64 |
| November 2007[2] | | | | 125.87 | -1393.51 |
| December 2007 | 650.10 | | 556.00 | 125.87 | -1,425.28 |
| January 2008 | 650.10 | 1,599.73 | | 125.87 | -2,500.78 |
| February 2008 | 650.10 | | | 125.87 | -1,976.55 |
| March 2008 | 650.10 | | | 125.87 | -1,452.32 |
| April 2008 | 650.10 | 1,599.72 | | 125.87 | -2,527.81* |
| May 2008 | 650.10 | | | 125.87 | -2,003.58 |
| June 2008 | 650.10 | | | 125.87 | -1,479.35 |
| July 2008 | 650.10 | 1,267.64 | | 125.87 | -2,222.76 |
| August 2008 | 650.10 | | | 125.87 | -1,698.53 |
| September 2008 | 650.10 | | | 125.87 | -1,174.30 |
| October 2008 | 650.10 | 1,267.64 | | 125.87 | -1,917.71 |
| November 2008 | 650.10 | | | 125.87 | -1,393.48 |
| **Ending balance** | | | | | **-1,393.48** |

* Lowest Projected Balance (LPB)

---

2. This analysis does not project and does not include Debtor's first post petition payment in November 2007, which was in fact paid, and included an escrow deposit of $ 707.20. Thus, even the Creditor's calculations are misplaced. While Countrywide states the November payment is included in the pre-petition surplus calculation, it is actually unaccounted given that the surplus is entirely eliminated from consideration by Countrywide upon the Debtor's Bankruptcy filing. (See Countrywide Response, 6/3/08, ¶ 14)

-3-

As is evident from Countrywide's analysis, they have simply eliminated the projected escrow surplus based on the Debtor's Bankruptcy filing and replaced it with a claimed "actual" surplus which is alleged to be zero. From this single act, and the subsequent analysis based on this act, the post petition shortage has been created as well as the resulting claim for an additional reserve requirement. The result of these additional claims will be the post petition collection of monies, for pre-petition events, which will result in repetitive and excessive payments by the Debtor of significantly more than what would have been paid but for the bankruptcy, or what Countrywide would be entitled to through the Debtor's Bankruptcy Chapter 13 Plan. Debtors assert that these actions violate 11 U.S.C. § 362(a) as follows:

a) <u>11 U.S.C. § 362(a)(1) and (6):</u> The commencement of action against the Debtor which could have been commenced prior to filing to collect a claim against the Debtor which arose prior to filing (the escrow shortage).

b) <u>11 U.S.C. § 362(a)(3)</u>: The commencement of an action to obtain property of the estate (Debtor's earnings).

Based on these wilful and intentional violations of the automatic stay, Debtors are entitled not only to corrective relief but also to complete damages including costs and attorney fees per 11 U.S.C. § 362 (k).

**ARGUMENT**

**COUNTRYWIDE'S ATTEMPT TO REASSESS THE ESCROW
AS A CONSEQUENCE OF THE BANKRUPTCY FILING VIOLATES
THE AUTOMATIC STAY, IMPEDES THE DEBTOR'S CHAPTER
13 PLAN AND CREATES A WINDFALL COLLECTION FOR
THE CREDITOR**

It must be clear what this case is not about. This is not a situation where the creditor needs to increase the Debtor's escrow post petition to stay on track with increasing taxes or insurance. This is also not a situation where and escrow shortage had accumulated over the

-4-

years and which would have been addressed at this time, irrespective of bankruptcy. Quite to the contrary, and quite admittedly, this escrow analysis and resulting the post-petition collection was directly related to, and caused by the Debtors filing for relief under Chapter 13. The creditor argues in fact:

> 16. [F]or example, had the Debtors been current on the Petition Date, there would have been an <u>actual</u> $ 2,494.89 surplus in their escrow account. If that had been the case, when Countrywide made its ledger for determining the lowest negative balance during the next year, it would have found a lowest negative balance of $ 5.89 ($2,500.78 (the lowest balance in the analysis done) less $ 2,494.89 (the surplus that would have existed)) **This would have effectively eliminated the shortage contribution of Debtors' post petition payment.** (Countrywide Home Loan Response submitted by Sarah Chen, Esq. And Thomas A. Connop, Esq. dated June 3, 2008, ¶ 16) Emphasis added.

Accordingly, if the Debtor's had been current, there would be no need for adjustment. Since however, the Debtors were not current, Countrywide was compelled to act. The problem with this simplistic statement is that Countrywide did not act prior to filing to collect this pre petition escrow shortage, but rather acted post petition and that constitutes an absolute violation of the automatic stay. Secondly, it is the purpose of the Chapter 13 plan to repay that exact shortage and deficiency which Countrywide is otherwise trying to collect.

Countrywide's reliance upon the "hypothetical" description of the word "projected" in their definition of the escrow belittles and obscures the significance of the concept, which as they correctly note is set forth under *Regulation X* (24 CFR § 3500.17). Given that real dollars are assessed and collected as a direct result of these calculations, the impact on the debtors is hardly hypothetical. This administrative formula is utilized to create a base line for collection of the Debtor's tax and insurance obligations, and to provide a cushion (<u>not to exceed 1/6th of the yearly disbursement</u>). By arbitrarily eliminating the projected surplus based on the bankruptcy, and then immediately switching to a new "actual" base line of zero to project forward, the creditor manufactures its own shortage and simply labels it post petition. It thus accelerates and inflates the collection of that pre petition event over what should have

-5-

and would have been paid otherwise in the Chapter 13 plan. The elimination of that projected surplus as a result of bankruptcy is neither administerial or benign, but rather a fairly creative manipulation of the escrow process which obscures the collection of pre petition shortages. This can be illustrated by commencing with a review of the side by side projected and actual escrow analysis for the approximate year period <u>pre-petition</u>, as shown below and again on the attached 10/15/07 statement (p. 5):

*Projected*                                                                                         *Actual*

| Date | Activity | Paid In | Paid Out | Balance | Date | Activity | Paid In | Paid Out | Balance |
|---|---|---|---|---|---|---|---|---|---|
| | **Beginning Balance** | | | **$ 474.45** | | **Beginning Balance** | | | **$ 474.45** |
| 12/1/2006 | Dec Payment | 707.20 | | 1,181.65 | 12/2/2006 | FHA MIP paym | | 127.62 | 346.83 |
| 12/2/2006 | FHA Payment | | 127.62 | 1,054.03 | 12/15/2006 | Dec Payment | 707.20 | | 1,054.03 |
| 1/1/2007 | Jan Payment | 707.20 | | 1,761.23 | 1/5/2007 | FHA MIP Paym | | 127.62 | 926.41 |
| 1/2/2007 | FHA MIP | | 127.62 | 1,633.61 | 1/22/2007 | City tax paym | | 1,599.73 | -673.32 |
| 1/2/2007 | City Taxes | | 1,476.97 | 156.64* | 2/6/2007 | FHA MIP Paym | | 127.62 | -800.94 |
| 2/1/2007 | Feb Payment | 707.20 | | 863.84 | 2/15/2007 | Jan Payment | 707.20 | | -93.74 |
| 2/2/2007 | FHA MIP | | 127.62 | 736.22 | 3/6/2007 | FHA MIP Paym | | 127.62 | -221.36 |
| 3/1/2007 | Mar Payment | 707.20 | | 1,443.42 | 3/3/02007 | Feb Payment | 101.65 | | -119.71 |
| 3/2/2007 | FHA MIP | | 127.62 | 1,315.80 | 4/5/2007 | FHA MIP Paym | | 127.62 | -247.33 |
| 4/1/2007 | Apr Paymnet | 707.20 | | 2,023.00 | 4/23/2007 | City Tax Paym | | 1,599.72 | -1,847.05 |
| 4/2/2007 | FHA MIP | | 127.62 | 1,895.38 | 5/4/2007 | FHA MIP Paym | | 125.87 | -1,972.92 |
| 4/2/2207 | City Taxes | | 1,476.96 | 418.42 | 6/6/2007 | FHA MIP Paym | | 125.87 | -2,098.79 |
| 5/1/2007 | May Payment | 707.20 | | 1.125.62 | 7/6/2007 | FHA MIP Paym | | 125.87 | -2,224.66 |
| 5/2/2007 | FHA MIP | | 127.62 | 998.00 | 7/27/2007 | City Tax Paym | | 1,267.64 | -3,492.30 |
| 6/1/2007 | Jun Payment | 707.20 | | 1,705.20 | 8/6/2007 | FHA MIP Paym | | 125.87 | -3,618.17 |
| 6/2/2007 | FHA MIP | | 127.62 | 1,577.58 | 9/7/2007 | FHA MIP Paym | | 125.87 | -3,744.04 |
| 7/1/2007 | Jul Payment | 707.20 | | 2,284.78 | 10/4/2007 | FHA MIP Paym | | 125.87 | -3,866.91* |
| 7/2/2007 | FHA MIP | | 127.62 | 2,157.16 | | End. Balance | | | -$ 3,869.91 |
| 7/2/2007 | City Taxes | | 1,,722.49 | 434.67 | | | | | |
| 8/1/2007 | Aug Payment | 707.20 | | 1,141.87 | | | | | |
| 8/2/2007 | FHA MIP | | 127.62 | 1,014.25 | | | | | |
| 9/1/2007 | Sep Payment | 707.20 | | 1,721.45 | | | | | |
| 9/2/2007 | FHA MIP | | 127.62 | 1,593.83 | | | | | |
| 10/1/2007 | Oct Payment | 707.20 | | 2,301.03 | | | | | |
| 10/2/2007 | FHA MIP | | 127.62 | 2,173.41 | | | | | |
| 10/2/2007 | City Taxes | 1,722.48 | | 450.93 | | | | | |
| 11/1/2007 | Nov Payment | 707.20 | | 1,158.13 | | | | | |
| 11/2/2007 | FHA MIP | | 127.62 | 1,030.51 | | | | | |
| | **Ending Balance** | | | **$ 1,030.51** | | | | | |

* Lowest Projected Balance

The above chart immediately reveals two substantial issues of concern.

- The "actual" ending balance <u>( - $ 3,869.91) is utilized for the proof of claim</u> as opposed to the true escrow monthly deposit contractually due for the missing pre-petition arrears which is higher ( 8 x 707.20 = $ 5,657.60). Countrywide relies on this reduction in favor of the Debtor in the POC as a basis for differentiation between pre petition actual disbursements (in the POC) and the remaining pre-petition escrow requirements (not in the POC). This then becomes the rationale for the post-petition collection, whereby Countrywide collects post petition not only the difference ($ 1,787.69) but substantially more than that amount claiming it all to be a post petition shortage.

- The <u>beginning balance utilized in the post petition analysis</u> ( $2,494.89) {page 2} is not found anywhere on the above chart as an ending balance, so it is questionable how it became the beginning projected balance post petition. The true projected balance as of the 11/07 date is $ 1,030.51. The methodology utilized to create the $ 2,494.89 beginning balance projected surplus is a manufactured creation that is part projected and part actual, but accurate in neither respect. That number is really a smokescreen and irrelevant in the case because it is zeroed out of the account anyway. For clarity though, as set forth in Countrywide's response (¶ 15), it took eight pre-petition payments *and one post petition payment* ($ 6,364.89), and then subtracted out the actual disbursements, ($ 3,869.91), then defined the result as a beginning projected balance surplus, which is then eliminated and reduced to zero.

By responding to the Bankruptcy filing with a reassessment which artificially becomes a zero starting point, Countrywide not only creates a post petition shortage and additional reserve demand requiring post petition repayment, but wholly ignores the impact and effect on the escrow balance by the repayment under Chapter 13, which is repaying the pre-petition arrears and escrow deficit (albeit at a reduced figure from the contractual and true pre petition escrow deficiency). This is clear from their post petition projected analysis (page 2 herein) which contains no provision for the $ 3,869.91 being repaid through the plan. If one otherwise accepts the progression demanded by Countrywide for the first twelve months post-

-7-

petition, it unquestionably shows the excess monies which the creditor will receive from the proposed reassessment.

|  | Amount | Actual Escrow Balance |  |
|---|---|---|---|
| 10/2/2007 |  |  |  |
| 10/12/07 (Date of Filing) |  | $ -3869.91 |  |
| + 11/07 Payment | $ 707.20 | $ -3,162.71 |  |
| + 12 Post Petition Payments (12/07-11/08) for Escrow, Shortage, & Reserve Per 10/15/07 Stm. 947.77 x 12 = | 11,373.24 | $ 8,210.52 |  |
| - 5 tax payments (10/07 - 11/08) | <7002.37> | $ 1,208.15 |  |
| - 13 PMI payments (10/07 - 11/08) 125.87 x 13= | < 1,636.31> | $ -428.15 |  |
| - Insurance | < 556.00> | $ -984.15 |  |
| + Ch. 13 Escrow Payments 13 x 64.48[3]= | 838.24 | **$ -145.91** | Actual Escrow Balance 11/30/08 |

In this manner, Countrywide has accelerated repayment and virtually eliminated the actual escrow deficiency within essentially the first year of the Chapter 13 plan. While exceedingly difficult to continue this analysis beyond the first year, since no one has the projection of costs, the overwhelming inequity and impropriety of this process by Countrywide is easily shown by simply making this a twelve month Chapter 13 plan with a balloon in November 2008. This increases the escrow balance as follows:

|  |  | $ -145.91 |  |
|---|---|---|---|
| + Ch. 13 Escrow Balance | 3,031.67 | **$ 2,885.76**[4] | Actual Escrow Balance - 11/30/08 |

---

[3] This equals 1/60th of the escrow in the POC. In reality, the number will likely be higher as the secured creditors will be paid ahead of unsecured in the Chapter 13 plan and not in sixty equal installments.

[4] This number is near double the projected balance of $ 1,487.13 for 11/08 which is found by continuing the 10/07projected analysis forward post petition without elimination or zeroing of any "surplus" or other treatment of the pre-petition default. This is described in detail below.

-8-

By examining the total monies received by Countrywide under this one year repayment analysis, the windfall created by the creditor's reassessment is even more apparent.

<u>Escrow Amount Due</u>
<u>Countrywide</u> - 10/10/07          **$ 5,657.60**     ( 8 x $ 707.20)

<u>Amount Paid</u> in Reassessment
and POC per Countrywide

| | | |
|---|---|---|
| CH 13 POC | $ 3,869.91 | |
| Shortage | $ 2,527.81 | |
| Reserve | <u>$ 1,044.26</u> | **$ 7,441.98** |

Countrywide has self created the collection of an **additional $ 1,784.38** towards the escrow balance due to Debtor's Chapter 13 filing, most of which will be paid within the first twelve months based on its creation of a shortage. It will also inflate the ultimate escrow balance well beyond the maximum 1/6th cushion permitted under RESPA (see 24 CFR Ch. XX § 3500.17 (c) (ii), which based on annual disbursement of $ 7,801.17, is $ 1,300.19)

Countrywide asserts there is no other workable solution, but this is simply not the case, a fact borne out by other creditors which continue the running of a "projected" balance forward as if there had been no default. This is consistent with the purpose of Chapter13 which is to repay the full default under the plan, and allow the debtor to reinstate without punishment and continue post petition unaffected. Such a progression utilizing Countrywide's projected balance as of 10/07, payments of post petition deposits and expenses as proposed by Countrywide in their assessment, and payment of the complete escrow arrears ( $ 5,657.60 x 1/60 = $ 94.29) demonstrate this fact:

| | Amount | Actual Escrow Balance | Projected Escrow Balance |
|---|---|---|---|
| 10/2/2007 | | | $ 2,173.41 |
| 10/10/07 (Date of Filing) | | $ -3,869.91 | |
| + 11/07 Payment | $ 707.20 | $ -3,162.71 | $ 2,880.61 |

-9-

| | | | |
|---|---|---|---|
| + 12 Post Petition Payments (12/07-11/08) for Escrow 650.10 x 12 = | $ 7,801.20 | $ 4,638.49 | $ 10,681.81 |
| - 5 tax payments (10/07 - 11/08) | <7002.37> | $ -2,363.88 | $ 3,679.44 |
| - 13 PMI payments (10/07 - 11/08) 125.87 x 13= | < 1,636.31> | $ -4,000.19 | $ 2,043.13 |
| - Insurance | < 556.00> | $ -4,556.19 | $ 1,487.13 |
| + Ch. 13 Escrow Payments 13 x 94.29 = | $ 1,225.77 | $ -3,330.42 | |
| ESCROW BALANCES AS OF 11/08[5] | | $ -3,330.42 | $ 1,487.13 |

Again, this is only one year and must be extended through the Chapter 13 plan, but by making this a twelve month Chapter 13 plan with a balloon in November 2008, it is easy to see how the Chapter 13 plan does and should repay the entire actual escrow deficit.

| | | | |
|---|---|---|---|
| | | $ -3,330.42 | |
| + Ch. 13 Escrow Balance | $ 4,431.82 | **$ 1,101.40** | **$ 1,487.13** |

Without question, Countrywide would prefer not to wait until the Debtors slowly repay their Chapter 13 plan to reduce their escrow deficit, but this is no different than the payment of principal and interest. The debtors are permitted per 11 U.S.C. § 1322 to cure their mortgage arrears through the provisions of Chapter 13, with the intent of Congress "that a cure pursuant to a plan **should operate to put the debtor in the same position as if the default had never occurred**." *In re Lammy*, 356 B.R. 168, 172 (Bkrtcy. E.D. Pa, 2006) citing 140 Cong. Rec. H10752-01, H107770 (Oct. 4, 1994). (emphasis added). See also *In re Olsen.*, 363 B.R. 908, 910 (8th Cir. BAP, 2007), citing *DiPierro v. Taddeo (In re Taddeo)*, 685 F.2d 24, 26-27 (2nd Cir., 1982) ("Thus the plain meaning of "cure" as used in § 1322(b)(2) and (5) is to remedy or rectify the default and restore matters to the *status quo ante*.) {emphasis in original}.

---

[5] The escrow deficiency shown here has been decreased less than an expected 1/5th due only to the timing of the petition and the inclusion of the five (5) tax payments in just a thirteen (13) month period. This thirteen month period is the time frame utilized by Countrywide in their analysis, so it is repeated. Subsequent years would reduce the deficiency balance at a minimum 20% rate, but probably more rapidly due to accelerated payments to secured creditors in Chapter 13.

Neither the provisions of Chapter 13 nor the automatic stay provide any exclusion for the escrow portion of those arrears. In fact, this is exactly the ruling of the Court in *In re Campbell*, 361 B.R. 831 (Bkrtcy, S.D. Tex, 2007), where the Court stated:

> [T]o the extent that Countrywide increased the Debtors' mortgage payment post petition to provide for the pre-petition Contractual Escrow Shortage, Countrywide attempted to collect and enforce a pre-petition debt against the Debtors and property of the estate post-petition in violation of the automatic stay. *Id* at 849.

The above citation is repeated herein because while Countrywide dismisses the applicability of the *Campbell* decision, deeper review suggests that it is exceptionally relevant. Although the mechanics of the Texas tax may differ slightly[6], the actions by Countrywide and the underlying manipulations to transfer pre-petition obligations to a post-petition accounting in order to collect same in violation of the Debtors bankruptcy is virtually the same. In *Campbell*, Debtors were also required to make pre-petition payments on their escrow account, but under Texas law, the payments or distribution were not made until a post petition date. Countrywide's attempt to argue that this entitled them to reassess the escrow and collect a shortage by calling it post petition was without basis and a clear violation of the automatic stay. The Court noted that "Countrywide's contractual right against the Debtors arose pre-petition in accordance with the terms of the Security Instrument, not post-petition with the taxes became due." *Id* at 841 (emphasis added).

Herein as well, Debtor's contractual obligation called for the payment of escrow deposits pre-petition in the amount of $ 707.20 per month. Debtor was in arrears and contractually due for eight (8) months or $ 5,657.60 at the time of the bankruptcy filing. This is the pre-petition shortage. Part of these funds are for actual disbursements (the $ 3,869.91 Countrywide chose to put in the proof of claim), but the remainder is the escrow balance due pre-petition, but payable

---

[6] Although not considerably since New Jersey taxes are also assessed on an annual basis in January for each year and payments are simply made in installments. See N.J.S.A. § 54:4-23 *ets*.

post petition. This is identical to the *Campbell* issue in Texas. By assessing this amount (and more) and attempting to collect these funds post petition, for a pre-petition default, Countrywide has in fact engaged in the same conduct the Court found objectionable, in violation of the automatic stay, and about which concluded:

> Taken as a whole, the Court reads § 362(a), § 1322(a)(2) and $ 1322(a)(5) to be properly reconciled as follows:
>
> 1. A debtor's pre-petition escrow deposit obligation may be cured under § 1322(a)(5).
>
> 2. The lender may, but is not obligated to pay pre-petition taxes that are due post petition.
>
> 3. A debtor's post-petition escrow obligation is not modified because of § 1322(b)(5), but **may not be adjusted upward based on the debtor's failure to make pre-petition escrow deposits**.
>
> *Supra*. at 848. (Emphasis added).

In spite of the creditor's protestations to the contrary, this opinion and judicial holding seems exceedingly on point, appropriate and instructive as to exactly the facts at bar.

Finally, the Debtor respectfully requests the Court to view these actions by Countrywide from a somewhat broader perspective, as the discussions of escrow by nature tend to degress into the detail and minutia. If the position of Countrywide were to be sustained, the impact on Debtors in general would be overwhelming and traumatic. Essentially, this would permit the mortgage holders to impose an immediate penalty on Debtors in the thousands of dollars for simply filing a Chapter 13 "cure and maintain" bankruptcy plan. While Debtors who are suffering and attempting to recover from some calamity which caused the delinquency and filing in the first instance, they would now be faced immediately with an automatic increase of their mortgage payments by hundreds of dollars to promptly replenish an escrow account and reserve. This is in addition to the obligations to the Chapter 13 Trustee payments (which often will contain other required payments on other secured, priority, or mandatory unsecured

-12-

payments due to a liquidation threshold or BAPCPA imposed minimum payment. Wholly apart from the legal issue that this constitutes a stay violation and that the payment of these monies is the exact purpose of the Chapter 13 plan, the additional burden imposed on Chapter 13 debtors is dramatic and in the end, counterproductive. It will cause more and more Chapter 13 debtors to be unable to maintain their homes, leading to more Motions for Stay Relief and ensuing foreclosures. In short, such a requirement is the antipathy of the goals underlying Chapter 13 bankruptcy.

                                                           Respectfully submitted,

                                                           */s/ Steven J. Abelson*
                                                          STEVEN J. ABELSON
                                                          Attorney for Debtors

Dated: June 20, 2008