**FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

---------------------------------------------------------X

In Re:

FRANCISCO RODRIGUEZ and                    Chapter 13
ANNA RODRIGUEZ
                                            Case No. 07-24687(MBK)


                            Debtors.

---------------------------------------------------------X
**APPEARANCES:**

Steven J. Abelson, Esq.
63 West Main Street
PO Box 7005
Freehold, New Jersey 07728
Attorney for the Debtors

Thomas A. Connop, Esq.
Sarah M. Chen, Esq.
Locke Lord Bissell & Liddell, LLP
885 Third Avenue, 26th Floor
New York, NY 10022
        -and-
Jennifer Novick, Esq.
Phelan Hallinan & Schmieg, PC
400 Fellowship Road, Suite 100
Mt. Laurel, NJ 08054
Attorneys for Countrywide Home Loans, Inc.

_____


**MICHAEL B. KAPLAN, U.S.B.J.**


                                **OPINION**

**I.    INTRODUCTION**

This dispute arises from post-petition escrow analysis of the mortgage account of Francisco and Anna Rodriguez ("Debtors") undertaken by the mortgagee, Countrywide Home Loans, Inc. ("Countrywide") pursuant to which Countrywide has recalculated and assessed an increase to the Debtors' required post-petition escrow deposits (as compared to the amount of the Debtors' pre-petition escrow deposits). Debtors contend that the additional escrow assessment constitutes an unlawful post-petition collection of a pre-petition obligation resulting in "repetitive and excessive payments by the Debtor of significantly more than what would have been paid but for the bankruptcy, or what Countrywide would be entitled to through the Debtor's Bankruptcy (sic) Chapter 13 Plan."[1] The Debtors filed the within motion asserting that post-petition collection of a pre-petition escrow shortage constitutes a violation of Debtor's rights under § 1322 of the Bankruptcy Code, as well as a violation of the automatic stay provisions set forth in 11 U.S.C. § 362(a). Specifically, Debtors assert that these actions violate 11 U.S.C. § 362(a) as follows:

a) 11 U.S.C. § 362(a)(1) and (6):

The commencement of action against the Debtors which could have been commenced prior to filing to collect a claim against the Debtors which arose prior to filing (the escrow shortage).

b) 11 U.S.C. § 362(a)(3):

The commencement of an action to obtain property of the estate (Debtors' earnings).

---

[1] See Debtors Reply Memorandum at P. 4 (Docket#53).

Based on these alleged willful and intentional violations of the automatic stay, Debtors seek corrective relief through the entry of an order directing Countrywide to reapply the alleged escrow balance, as well as recovery of damages, including costs and attorney fees, pursuant to 11 U.S.C. § 362 (k).

For the reasons which follow, this Court determines that Countrywide's actions were in compliance with its loan documentation and the Real Estate Settlement Procedures Act, 12 U.S.C.§ 2601, *et seq.* ("RESPA"), and thus, were not undertaken in violation of any provision of the Bankruptcy Code. However, the Court does find that Countrywide acted arbitrarily in the method of calculating the Debtors' escrow shortage and, therefore, orders Countrywide to issue a corrected escrow ledger in projecting the summary balance of the Debtors' escrow account, consistent with the findings contained herein.

## II.    JURISDICTION

This court has jurisdiction over the contested matter under 28 U.S.C § 1334(a) and 157(a) and the Standing Order of the United States District Court dated July 10, 1984 referring all bankruptcy cases to the bankruptcy court. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(O). A hearing on this matter was held on June 25, 2008.

## III.    FACTS

The following constitutes the Court's findings of fact and conclusions of law as

required under Fed. R. Bankr. P. 7052.[2]

On October 10, 2007 (the "Petition Date"), Francisco and Ana Rodriguez filed a Voluntary Petition, seeking relief under Chapter 13 of the Bankruptcy Code. Countrywide is the holder of a purchase money mortgage on Debtors' real property at 32 Hedgewood Road in Howell, New Jersey. On January 15, 2008, Countrywide filed its proof of claim. In the proof of claim, Countrywide calculates pre-petition arrears at $ 21,283.71, including line items as follows:

> Monthly Payments (8 months @ $1,898.35)- $ 15,186.80
> Foreclosure Fees- $700.00
> Foreclosure Costs- $1,527.00
> Escrow Shortage-$3,869.91
> Total Pre-petition Arrears- $ 21,283.71

It is undisputed that the escrow shortage of $3,869.91 reflects sums actually advanced and disbursed pre-petition by Countrywide, to meet the Debtors' real estate tax and insurance obligations, which exceeded the sums deposited by Debtors in their account through their monthly escrow deposits. If Debtors had been current in their monthly payments to Countrywide and Countrywide had debited their escrow account for the amounts disbursed, the remaining balance in Debtors' escrow account on the Petition Date would have been $2,494.84 ($6,364.80 received from Debtors less $3,869.91 paid out by Countrywide).

Countrywide's proof of claim also fixes Debtors' post-petition monthly mortgage payment at $2,846.12, effective 2007, calculated to include the following:

---

[2]To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

| **Item** | **Amount** |
|---|---|
| Principal & Interest | $1,893.35 |
| Required Escrow | $ 650.10 |
| Shortage Contribution | $ 210.62 |
| Required Reserve | $ 87.02 |
| Total | $2,846.12 |

As is evident from the foregoing calculations, upon the filing of Debtor's petition, Countrywide increased Debtor's post-petition payments in the amount of $210.65 per month, alleging the collection of an escrow shortage of $2,527.81. In this regard, Countrywide treated Debtors' escrow account as having a zero balance as of the Petition Date. In other words, for purposes of calculating the post-petition payment, Countrywide treated the escrow account as if there had been neither an escrow account deficit nor surplus on the Petition Date. Countrywide then calculated the Debtors' post-petition escrow deposit obligations utilizing a twelve month projection, permitted by RESPA, to fix the Debtors' post-petition escrow deposit at $947.74, comprised of (1) $650.10 "base" escrow payment, (2) $210.62 shortage contribution, and (3) $87.02 required reserve. Countrywide prepared the following projected balance of the Debtors' escrow account to fix the "shortage contribution" component:

| Month | Escrow Deposit(s) | Taxes Payments | Insurance. | MIP/PM Payment | **Balance** |
|---|---|---|---|---|---|
| Beginning Balance | | | | | **$2,494.89** |
| | -2494.89 | | | | **0** |
| 07-Oct | | 1,267.64 | | | **-1,267.64** |
| Nov-07 | | | | 125.87 | **-1393.51** |
| Dec-07 | 650.10 | | 556.00 | 125.87 | **-1425.28** |
| Jan-08 | 650.10 | 1599.73 | | 125.87 | **-2500.78** |
| Feb-08 | 650.10 | | | 125.87 | **-1976.55** |
| Mar-08 | 650.10 | | | 125.87 | **-1452.32** |
| Apr-08 | 650.10 | 1599.72 | | 125.87 | **-2527.81** |
| Ma- 08 | 650.10 | | | 125.87 | **-2003.58** |
| Jun-08 | 650.10 | | | 125.87 | **-1479.35** |
| Jul- 08 | 650.10 | 1267.64 | | 125.87 | **-2222.76** |
| Aug-08 | 650.10 | | | 125.87 | **-1698.53** |

5

| | | | | | |
|---|---|---|---|---|---|
| Sep-08 | 650.10 | | | 125.87 | **-1174.30** |
| Oct-08 | 650.10 | 1267.64 | | 125.87 | **-1917.71** |
| Nov-08 | 650.10 | | | 125.87 | **-1393.48** |
| End Balance | | | | | **-1393.48** |
| | *Lowest Projected Balance | | | | |

The above chart reveals that Countrywide calculates the Debtors' lowest possible escrow balance during the projected twelve month period as occurring in the month of April, 2008, when the escrow balance would be a negative $2,527.81. Countrywide, by assessing the Debtors' escrow account an additional monthly sum of $210.62, seeks to recover the shortage over the twelve month period commencing December, 2007. The Debtor, however, feels Countrywide's increased escrow demands represent an unlawful effort to recover the pre-petition escrow shortage over a twelve month period, as opposed to the length of the Chapter 13 plan (sixty months).

## IV.  DISCUSSION

Contractually, the Debtors' mortgage provides that the Debtors shall pay all property taxes.[3] However, the mortgage further requires that the Debtors pay amounts due for property taxes to the lender as future escrow items throughout the 12-month period preceding the month in which the property taxes are due. Such payments must be made concurrently with the principal and interest payments due to the lender each month.

The amount of the required escrow funds is determined in accordance with ¶ 2 of the mortgage, which provides that the lender "may, at any time, collect and hold amounts for Escrow Items in an aggregate amount not to exceed the maximum amount that may

---

[3]See ¶2 of mortgage, dated March 25, 2005, annexed to Countrywide's filed proof of claim and marked as C-2 at the June 25, 2008 hearing.

be required for Borrower's escrow account under [Real Estate Settlement Procedures Act (" RESPA")], except that this cushion or reserve permitted by RESPA for unanticipated disbursements....." As a result, a lender must estimate future property taxes and assessments, as well as insurance premiums, and allocate the estimated sum over a period sufficient to provide adequate funds to pay the escrow charges when due. This right is limited by RESPA which proscribes lenders from requiring a borrower to deposit in any escrow account an aggregate sum which exceeds the amount sufficient to pay taxes, insurance premiums and other charges with respect to the property during the ensuing twelve-month period, plus one-sixth of the estimated total of such amounts. 12 U.S.C. § 2609(a).[4] This limitation, however, is subject to exception. If the lender determines that a deficiency exists, the lender may require the borrower to make additional monthly deposits into the escrow account to remedy such deficiency, but must notify the borrower of any shortage of funds. 12 U.S.C. § 2609(a)(2), (b). Upon the borrower's payment of the escrow amounts, the mortgage requires the lender to hold the funds in accordance with RESPA and to apply the funds to pay the escrow charges when due, but no later than the time specified under RESPA.

---

[4] Section 10 of RESPA places limits on the amount a lender or servicer may require a mortgager to keep in his or her escrow account to cover the payments of taxes, insurance, or other disbursements. 12 U.S.C. § 2609(a). This section also governs a servicer's obligations with respect to providing an annual escrow account statement (i.e., escrow analysis) and notice "not less then annually" of any shortage in the escrow account. 12 U.S.C. § 2609(b). The regulation governing RESPA can be found at 24 CFR § 3500. This regulation is sometimes referred to as Regulation X (herein "the Regulation"). The regulation dealing with escrow accounts can be found at part 3500.17, and the latest escrow account provisions became effective October 1997.

RESPA, which was passed in 1974 to assure a good-faith handling of these matters, prescribes an "Aggregate Analysis"[5] to calculate escrow deposits. RESPA Regulation X, 24 C.F.R. § 3500.17 (b), (d)(1) (2007). In such an analysis, the "base" escrow deposit is determined by estimating the payments that the lender will have to make for taxes, insurance and the like over the next twelve months. That estimated amount is then divided by twelve to determine the monthly base escrow deposit. See 24 C.F.R. § 3500.17 (c)(1)(ii) (generally describing the components of escrow) and 24 C.F.R. § 3500.17 (d)(1)(A) (2007) (explaining how to project a "trial balance"). RESPA allows this calculation to occur on many different occasions, including at the inception of a loan, on the anniversary date of the loan, or on other dates of the lender's choosing. See 24 C.F.R. § 3500.17 (c)(2) (analysis at the beginning of the loan), 24 C.F.R. § 3500.17 (c)(3) (analysis at the end of the computation year), and 24 C.F.R. § 3500.17 (f)(1)(ii) ("[T]he servicer may conduct an escrow analysis on other times during the escrow computation year"). Countrywide performed this analysis to determine Debtors' post-petition base escrow deposit.

RESPA also authorizes lenders, like Countrywide, to calculate and collect certain "advance deposits in escrow accounts," or shortage contributions, in order to minimize any negative balance that may occur in a borrower's escrow account over the twelve months when Countrywide must disburse funds to protect the property (e.g., insurance,

---

[5]For purposes of Regulation X, an escrow analysis is the accounting that a servicer conducts in the form of a trial running balance for an escrow account to:
    a. Determine the appropriate target balances;
    b. Compute the borrower's monthly payments for the next escrow account computation year and any deposits needed to establish or maintain the account; and
    c. Determine whether shortages, surpluses, or deficiencies exist.

PMI payments, and taxes). See 12 U.S.C. § 2609(a)(2) (2007) ("in the event the lender determines there will be or is a deficiency he shall not be prohibited from requiring additional monthly deposits in such escrow account to avoid or eliminate such deficiency"). [6]

To calculate the escrow shortage contribution, a ledger is created reflecting a projected summary balance of a debtor's escrow account, assuming that all deposits of base escrow balance during the next twelve months is determined, as it is in the case at bar. If that balance is negative, then that negative balance (the shortage) is divided by twelve to determine the monthly escrow shortage contribution.[7] See 24 C.F.R. § 3500.17 (c)(1)(ii) (generally describing the components of escrow), (d)(1)(i)(c) (2007) (describing the calculation of the "cushion"). RESPA generally requires all escrow shortages to be repaid to a lender within twelve months. 24 C.F.R. § 3500.17(f) (2007).

The Debtors acknowledge in their pleadings that prior to the bankruptcy filing on October 10, 2007, there was an eight month arrearage owing Countrywide, which

---

[6] RESPA also authorizes a lender to collect as part of the monthly escrow deposit an additional "reserve". The "reserve" is calculated by multiplying the total estimated annual cost for insurance and taxes only by .166 (1/6, or 2 months), which amount is then divided by 12 to determine the monthly reserve deposit. See 24 C.F.R. § 3500.17 (c)(1)(ii). In the case at bar, the "reserve" component of the post-petition payment is $87.02 per month and is uncontested.

[7] If the amount in the escrow account not only falls below the required amount but is negative (i.e., where the servicer has had to use its own funds to make a disbursement), then there is an escrow deficiency. As with an escrow shortage, if the amount of the deficiency is less than one monthly escrow payment, the servicer *may* require the borrower to pay the deficiency within 30 days. However, if the amount of the deficiency is equal to or greater than one monthly escrow payment, the servicer *may* require the borrower to repay the amount over 2-12 months (Emphasis added). A servicer also has the option to allow the deficiency to exist and do nothing to change it. 24 CFR. § 3500.17(f)(4).

arrearage depleted the escrow account, leaving a negative balance of $-3,869.91. Debtors further admit that had they been current in payments at the time of the filing, there would have been a positive balance of $450.93, after payment of the October, 2007 quarterly tax payment. Notwithstanding, Debtors submit that Countrywide is taking advantage of the bankruptcy filing to impose unreasonable and unsupportable monetary burdens upon the Debtors by seeking to recover the escrow "cushion" permitted under RESPA. Debtors, however, fail to explain satisfactorily why such rights afforded lenders under RESPA should be abrogated in the context of a Chapter 13 bankruptcy proceeding. Debtors' required shortage contribution is a charge authorized by and calculated in accordance with RESPA, as well as the underlying loan agreement; as such, any modification of such rights would contravene the prohibition against modifying the rights of a holder of a claim secured by a security interests in a debtor's principal residence, found in 11 U.S.C. § 1322(b)(2).

This Court finds no merit in the Debtors challenge to Countrywide's methodology of fixing its pre-petition claims. In this regard, Debtors argue:

> The "actual" ending balance ( - $ 3,869.91) is utilized for the proof of claim as opposed to the true escrow monthly deposit contractually due for the missing pre-petition arrears which is higher ( 8 x 707.20 = $ 5,657.60). Countrywide relies on this reduction in favor of the Debtor in the POC as a basis for differentiation between pre petition actual disbursements (in the POC) and the remaining pre-petition escrow requirements (not in the POC). This then becomes the rationale for the post-petition collection, whereby Countrywide collects post petition not only the difference ($ 1,787.69) but substantially more than that amount claiming it all to be a post petition shortage.[8]

---

[8] See Debtors Reply Memorandum at P. 7 (Docket#53).

In effect, Debtors seek to have Countrywide include in its pre-petition arrearage, to be paid over the life of the Chapter 13 plan, not only sums actually disbursed by Countrywide for items such as taxes and insurance, but also such additional sums the Debtors should have paid into the escrow account prior to filing. Moreover, Debtors contend that in projecting the twelve month summary balance of the Debtors' escrow account, Countrywide should not have started at zero, but rather should have calculated the lowest projected escrow balance as if the Debtors had made the requisite pre-petition monthly payments. This arguments finds support in Judge Manger's extensive and thorough analysis outlined in In re Fitch, 2008 WL 1791197 (Bankr. E. D. La. 2008), in which debtors are afforded the benefit of a hypothetical positive balance in their escrow account for purposes of calculating their post-petition escrow obligations. Under this method, a mortgagee would be required to fund any escrow deficiency in the first year of a debtor's bankruptcy case, essentially floating the debtor an interest-free loan. This Court is troubled by such a result and is not prepared to leap into the "Alice in Wonderland" approach to mortgage servicing, in which lenders are required to credit an escrow account for payments not made, while coming out of pocket to advance additional payments of taxes and insurance on behalf of Chapter 13 debtors. Indeed, as argued by Countrywide, this is the very result RESPA seeks to avoid in allowing the collection of the shortage component.

Countrywide does not dispute that the Debtors' obligation to pay property taxes[9] and insurance arose pre-petition and that the mortgage instrument provides that the lender shall collect and hold such amounts as outlined in ¶2 of the mortgage, and may advance funds for payment of such obligations in the event there is an escrow shortage. Instead, Countrywide asserts that as between itself and the Debtors, no claim arose in its favor until it paid the taxes and an escrow shortage accrued. In this regard, Countrywide contends that its pre-petition claim should be limited to the amounts actually disbursed. This Court agrees.  In collecting escrow amounts as part of the mortgagors' monthly mortgage payments, Countrywide serves merely as a conduit for such payments and should only recover in bankruptcy for such items actually disbursed on behalf of mortgagors.  A "right to payment", as incorporated in the statutory definition of "claim" under 11 U.S.C. § 101(5) implicitly encompasses a right of retention, which is not subsumed in Countrywide's "right to collect" escrow items. Absent sums actually expended, as permitted under the loan documents to protect its own collateral interest, Countrywide need not include pre-petition escrow arrears in its proof of claim inasmuch as the mortgage instrument only permits Countrywide to retain such funds as reimbursement to the extent of actual advances. Otherwise, Countrywide merely collects and holds such funds for payment to third parties.

This Court acknowledges that the relevant mortgage instruments permit Countrywide to declare a default in the event the Debtors' fail to make their monthly

---

[9]Pursuant to N.J.S.A. 54:5-6, real estate taxes in New Jersey become liens upon assessment, which occurs annually on the first day of October, to be paid in installments as set forth in N.J.S.A. 54:4-66 and 66.1, as appropriate.

payments (including escrow portion). However, Countrywide's right to declare a default, in and of itself, does not allow recovery, through a proof of claim, for such amounts owing third parties. For instance, if prior to filing bankruptcy, a debtor fails to maintain the property in compliance with local property maintenance codes, resulting in the assessment of fines which become liens against the residence, the mortgage would be in default; yet, any proof of claim to be filed by the lender would not include the amounts of such fines unless actually advanced to preserve the lender's collateral interest. This Court sees no distinction of consequence with the circumstances at bar. More significantly, even if Countrywide's proof of claim were to include the eight unpaid pre-petition escrow deposits, as the Debtors advocate, neither the Bankruptcy Code nor RESPA preclude Countrywide from undertaking a re-examination of the escrow account to calculate the requisite escrow shortage contribution. In this scenario, however, the projected escrow deposits would have to include anticipated disbursements by the Chapter 13 trustee for such portions of the monthly trustee payment which could be attributed to escrow deposit arrears owing the lender; indeed, accurate escrow projections would be a daunting and nearly impossible task given the need to also account for priority payments for debtors' attorneys fees and pro-rata distributions to other secured creditors.

     Outside of bankruptcy, mortgagors with a negative escrow account can and should expect to have their escrow account re-examined, in accordance with RESPA regulations, and be assessed an additional monthly charge for the escrow shortage. No one would suggest that non-debtors could seek to have a lender calculate an escrow

shortage contribution, by giving credit for missed monthly payments. Certainly, there is no reason to afford Chapter 13 debtors with such rights, and this Court finds nothing in either RESPA or the Bankruptcy Code which mandates such a result. Accordingly, this Court regards Countrywide's approach in treating the Debtors' escrow account as having a zero balance as logical, reasonable and supported by applicable non-bankruptcy law.

Having determined that Countrywide is entitled, as a matter of law, to calculate and collect the shortage contribution as part of the post-petition monthly escrow deposit, this Court does not agree that the Debtors' lowest possible escrow balance during the twelve months following the calculation of their escrow payment to be $2,527.81, as Countrywide asserts. Countrywide acknowledges that the "Aggregate Analysis" to calculate escrow deposits prescribed by RESPA permits such calculation to occur "on many different occasions, including at the inception of a loan, on the anniversary date of the loan, or on other dates of the lender's choosing(emphasis added)(citations omitted).[10] Indeed, the introduction to Section (d) of Regulation X, which sets forth the steps for conducting an escrow analysis, confirms that while the steps in conducting the analysis are required steps, the cushions are nevertheless permissive. In particular, section (d) provides:

> The steps set forth in this section derive maximum limits. Servicers may use accounting procedures that result in lower target balances. *In particular, servicers may use a cushion less then the permissible cushion or no cushion at all. This section does not require the use of a cushion.* (Emphasis added).

For purposes of its trial balance projection, Countrywide assumes an effective date for the escrow change that is the first day of the second month after the month in

14

which the analysis is performed. In preparing its ledger to reflect a projected summary balance of the Debtors' escrow account, and to pinpoint the lowest possible escrow balance,[11] Countrywide employs an "effective date" of December 1, 2007, yet commences the analysis with a zero balance for the month of October, 2007.[12] Countrywide then takes into account the charge items for the months of October and November, while ascribing no projected escrow deposits for these months. The result is an escrow balance on the "effective date" of $-1,393.51. This Court views Countrywide's decision to undertake its analysis in this fashion to be both arbitrary and penal. Given the ample latitude provided under Regulation X, there is no reason why Countrywide could not commence its projection of the Debtors' escrow account with a zero balance through November 30, 2007 (the day before Countrywide's deemed "effective date), and thereafter project escrow deposits and charges for the next twelve months, through November, 2008, as reflected below:

| Month | Escrow Deposit(s) | Tax Payment(s) | Insurance Payment(s) | MIP/PMI payment(s) | **Balance** |
|---|---|---|---|---|---|
| Start Balance Nov-07 | | | | | **0.00** |
| Dec-07 | 650.10 | | 556.00 | 125.87 | **-31.77** |
| Jan-08 | 650.10 | 1599.73 | | 125.87 | **-1107.27** |
| Feb-08 | 650.10 | | | 125.87 | **-583.04** |
| Mar-08 | 650.10 | | | 125.87 | **-58.81** |
| Apr-08 | 650.10 | 1599.72 | | 125.87 | **-1134.30** |
| May-08 | 650.10 | | | 125.87 | **-610.07** |

---

[10]See ¶7 of Countrywide's Response in Opposition (Dkt# 44).

[11]Refer to chart beginning on P. 5.

[12]In its Post Hearing Brief, Countrywide acknowledges that the escrow trial balance should incorporate a projected November 1, 2007 base escrow deposit in the amount of $650.10, which would reduce the Debtors' monthly payment by approximately $54.00. Under the Court's suggested approach, described herein, the savings, however, are greater.

15

| | | | | | |
|---|---|---|---|---|---|
| Jun-08 | 650.10 | | | 125.87 | **-85.84** |
| Jul-08 | 650.10 | 1267.64 | | 125.87 | **-829.25** |
| Aug-08 | 650.10 | | | 125.87 | **-305.02** |
| Sep-08 | 650.10 | | | 125.87 | **219.21** |
| Oct-08 | 650.10 | 1267.64 | | 125.87 | **-524.20** |
| Nov-08 | 650.10 | | | 125.87 | **0.03** |
| End Balance | | | | | **12.03** |
| | | | | | |
| TOTALS | 7813.20 | 5734.73 | 556.00 | 1510.44 | **12.03** |

Using the above approach, the lowest possible escrow balance still occurs in April, 2008 at $-1134.30, which would represent an additional monthly charge of $94.53, considerably less than the requested $210.65.

Lastly, to the extent Debtors have relied upon the recent decision in Campbell v. Countrywide Home Loans, Inc., 361 B.R. 831 (Bankr. S.D. Tex. 2007), such reliance is misplaced. In Campbell, the court found that Countrywide violated the automatic stay when it acted to collect and enforce a pre-petition debt against the Debtors and property of the estate post-petition. Campbell v. Countrywide Home Loans, Inc., 361 B.R. 851 (Bankr. S.D. Tex. 2007). However, the central issue in Campbell was a Texas state law issue regarding whether certain property taxes are a pre or post-petition debt, which is not the issue at hand. Countrywide's calculation and assessment of a shortage contribution is not an attempt to collect a pre-petition obligation or "double collection" of Debtors' pre-petition escrow deficits. Rather, the shortage contribution is authorized under RESPA to minimize the risks to lenders where there are disbursements of funds to protect the underling property before the escrow account contains sufficient funds to pay such amounts.

## V.  CONCLUSION

Debtors' motion is granted in part, and denied in part. This Court finds no violations of 11 U.S.C. § 362(a); however, Countrywide is directed to recalculate the Debtors' shortage component of the post-petition escrow deposit in conformance with this decision. All parties are to bear their respective attorneys fees and costs; in this regard, notwithstanding any contract provision to the contrary, Countrywide is directed expressly not to charge Debtors' account with attorneys fees or costs incurred for this dispute. Counsel for Countrywide is directed to submit an appropriate form of order.

Dated: July 22, 2008

*[signature]*
Honorable Michael B. Kaplan
United States Bankruptcy Judge